## ROLEN v. CALLICUTT et al.

No. 34663.   March 13, 1951.

*228 P. 2d 1010.*

Koch & Woodliff, Henryetta, for petitioner.

Pierce, Rucker, Mock, Tabor & Duncan, Oklahoma City, and Mac Q. Williamson, Atty. Gen., for respondents.

O'NEAL, J.  This is a proceeding by petitioner, Gussie Rolen, to review an order of the State Industrial Commission denying her compensation.

The record discloses that on September 30, 1949, petitioner filed her claim for compensation against her employers, D. C. Callicutt and Ann Willard, doing business as Whiteway Cafe, and their insurance carrier, Utilities Insurance Company, in which she stated that on the 4th day of March, 1949, while in the employ of respondents Callicutt and Willard and while engaged in carrying an armload of dishes, she struck her right foot against a Coca-Cola box causing such injury to her foot as made it necessary thereafter to amputate the foot. Respondents resisted payment of compensation on the ground that the petitioner was not engaged in an employment defined as hazardous under the Workmen's Compensation Act at the time she claimed to have sustained her injury and on the further ground that the loss of the foot was not due to any accidental injury, but was due to a pre-existing condition.

One employed as a waitress in a cafe is not engaged in an employment defined as hazardous by the Workmen's Compensation Act. 85 O. S. 1941 §2.

Petitioner does not otherwise contend but relies on the Act of April 17, 1947, 85 O.S.A. §§65.1 to 65.4 to sustain her claim.

It is stipulated that respondents Callicutt and Willard carried a comprehensive workmen's compensation and liability policy for the benefit of their employees, the policy number was W. C. 58363; that their insurance carrier paid petitioner compensation up to and including July 13, 1949.

The trial commissioner, among other things, found:

"That the respondent carried a policy of insurance with the Utilities Insurance Company wherein the claimant was scheduled as a person employed

by respondent for the purpose of paying or collecting insurance premiums on a workmen's compensation insurance policy, and that the insurance carrier collected premiums on said policy covering the liability of the employer under the Workmen's Compensation Law of Oklahoma by reason of the employment of the claimant, and that the respondent and insurance carrier are estopped to deny that the claimant was employed by the respondent in a hazardous employment, subject to and covered by the Workmen's Compensation Law, as amended by Title 85, O.S.A. Sections 65.1, 65.2 and 65.3."

The trial commissioner, in substance, further found that on the date stated in her complaint and in the manner stated and while in the employ of respondents, she sustained an injury to her right foot which resulted in a loss of the foot by amputation and awarded compensation accordingly.

The award was vacated on appeal to the commission en banc. The commission found that petitioner did not sustain an accidental injury as claimed, but that her injury was due to a pre-existing condition and entered an order denying compensation.

It is contended by petitioner that the finding of the commission in this respect is not supported by any competent evidence.

Petitioner, in substance, testified on and prior to March 4, 1949, she was employed as a waitress in the Whiteway Cafe which was owned and operated by respondents Callicutt and Willard; that on that day, while carrying an armload of dishes, she struck her right great toe against a Coco-Cola box causing injury to her foot. A few days thereafter, and on March 6, she called upon Dr. Cotteral who treated her toe for about a week but she got no relief from such treatment. She then saw Dr. Tannehill who advised her to keep a hog bag on the toe and put some medicine on it. He treated her until the 19th day of March when she called upon Dr. Haynes. It was then discovered that infection had set up in the toe. The toe was thereafter amputated. The infection, however, continued and finally affected the foot and the foot was thereafter amputated.

Petitioner further testified that neither her toe nor foot had ever been injured prior to March 4, 1949, and that she did not have the toe or foot treated by any doctor prior to that time.

Dr. Cotteral, one of the doctors referred to by petitioner in her testimony, testified that on February 26, 1949, and prior to the date of the alleged accident, he was called upon to examine petitioner's foot. He found her then suffering from an ingrown toe nail. The toe was sore and swollen. He prescribed treatment. He again saw petitioner on the 3rd day of March, 1949, the day before the alleged accident. Her toe was then considerably infected. He placed some cotton under the nail and gave her penicillin.

Dr. Tannehill testified he saw, examined and treated petitioner's toe on March 5, 1949, one day after the alleged accident. Her toe was then badly infected; her right foot was then swelling and turning black. She was under his care until the 11th day of March. He gave her some ointment and used penicillin. He testified that in his opinion the toe was infected at least a week or ten days prior to March 4, 1949. He further testified that petitioner then gave him no history of having injured the toe.

A chiropractor testified that on February 17, 1949, while treating petitioner for some other trouble, she was requested to examine her foot. She found her right great toe was then slightly infected as the result of an ingrown toe nail. She prescribed "akro" to be used on the toe.

All of these doctors testified from their records.

Dr. Haynes, testifying in behalf of petitioner, stated that he first saw and examined her toe on March 19, 1949;

that he obtained a history from her of having struck her toe against a Coca-Cola box while carrying an armload of dishes. He found the toe then badly infected. The toe nail was removed. Tonic and a vitamin preparation was prescribed and penicillin given. This treatment did not stop infection and the toe was thereafter amputated. Infection still spread and affected the foot and the foot was thereafter amputated at junction of the middle and lower one-third of the leg.

The doctor further testified from the history of the case given him by petitioner and subsequent developments, it was his opinion that the loss of her foot was caused by the accident occurring on March 4, 1949. The doctor on cross-examination testified that petitioner gave him no history of having been treated by other physicians for infection of her toe caused by an ingrown toe nail. The doctor was then asked:

"Q. Now Doctor, if you had a history that her toe was in bad condition and infected and been treated by several doctors prior to March 4th would your opinion be any different than what it is now? . . . A. Well, if I had had a history of that case your answer would be obvious but I did not have a history of having that. She gave me a history of a bruise."

This, in substance, constitutes the evidence offered in the case. While it is somewhat conflicting, we think the commission was justified in concluding therefrom that the loss of petitioner's foot was due to infection resulting from the ingrown toe nail rather than to the claimed injury. The order of the commission denying compensation is amply supported by the evidence.

Order sustained.

ARNOLD, C.J., LUTTRELL, V.C.J., and WELCH, CORN, DAVISON, and HALLEY, JJ., concur.